**NOT FOR PUBLICATION**
(Also Docket at: Main Case: 09-20221-GLT, Related to Doc. No. 100)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>THERESA K. SLAUGHTER,<br><br>Debtor. | Case No. 09-20221-GLT<br>Chapter 13 |
| THERESA K. SLAUGHTER,<br><br>Plaintiff,<br><br>v.<br><br>VA PITTSBURGH EMPLOYEES FEDERAL CREDIT UNION and PAMELA J. CURCIO,<br><br>Defendants. | Adv. Proc. No. 13-02231-GLT |

## MEMORANDUM OPINION

Counsel:   Dai Rosenblum, Butler, PA, Counsel for the Plaintiff
            Robert J. Colaizzi, Pittsburgh, PA, Counsel for the Defendants

The Debtor, Theresa K. Slaughter (the "Debtor"), brings this matter before the Court upon her *Complaint* (the "Complaint") against VA Pittsburgh Employees Federal Credit Union (the "Pittsburgh FCU" or "Credit Union") and Pamela J. Curcio ("Curcio" and, together with the Credit Union, the "Defendants"). Also before the Court is the *Motion for Sanctions for Willful Violation of the Automatic Stay* [Doc. No. 100] (the "Motion") filed by the Debtor against Defendants.[1] The Court finds and the parties aver that the matters before the Court are core proceedings pursuant to 28 U.S.C. § 157(b)(2). The Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This *Memorandum Opinion* constitutes this Court's

---

[1] The Motion was filed in the main bankruptcy case at Case Number 09-20221-GLT. The Complaint and the Motion involve the same parties and overlapping issues. Accordingly, the Court scheduled an evidentiary hearing to consider both matters simultaneously.

1

findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. Having considered the written submissions of the parties, the testimony offered at a trial, and the documentary evidence presented, this Court will enter partial judgment in favor of the Plaintiff and against the Defendant Credit Union. All claims asserted against Defendant Curcio are denied.

**I.**

This case involves the relationship between the Debtor and her credit union. For years, the Debtor relied upon the Credit Union to fund various loan requests as her needs dictated. The Credit Union was happy to accommodate because it was assured of timely loan payments through automatic transfers from the Debtor's accounts. Once the Debtor filed for bankruptcy protection, the parties continued their practice unaltered and without disclosure or Court approval. Instead, the Credit Union continued to make loans and the Debtor facilitated the loan payments. Although most of the automatic transfers were used to satisfy prepetition obligations, the Debtor made no complaint while the Credit Union continued to loan her money. These loan proceeds were used to fund the purchase of a car and other items. When the Credit Union eventually denied a loan request, the scheme unraveled, and the Debtor was now offended by the Credit Union's conduct. Because both parties must be accountable for their actions, the Credit Union must repay the amounts it improperly received plus certain additional sanctions. The Debtor's claims are largely denied because of her role in these transactions.

**A.    The Parties**

The Debtor filed a voluntary petition for relief under chapter 13 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") on January 13, 2009. As of the date of her bankruptcy, the Debtor was an employee of the U.S. Department of Veterans Affairs (the "VA") hospital on Highland Drive in Pittsburgh, Pennsylvania.

Through her employment, the Debtor maintained accounts with several of the

credit unions accessible to VA employees.[2] These credit unions included the Pittsburgh FCU and the University Drive VAH FCU (the "University Drive FCU").[3] On August 1, 2012, the University Drive FCU merged into the Pittsburgh FCU, and thereafter, all of the Debtor's remaining accounts were held by a single entity, the Credit Union (as successor).[4]

Defendant Pamela Curcio was the CEO/Manager of the Credit Union prior to and after its merger with University Drive FCU. Ms. Curcio testified that she never was employed by the University Drive FCU, which until the merger, was a wholly separate entity maintaining offices in another part of town.

### B.    The Debtor's Loans with University Drive FCU

The Debtor has a long history with the Credit Union, spanning more than 19 years. Although the Debtor engaged in numerous transactions during that time, the matters at issue relate to various loans and loan payments involving the University Drive FCU that predate its 2012 merger. In addition to those prepetition loans disclosed on the Debtor's Schedules (as amended),[5] the Debtor also obtained certain postpetition loans from the University Drive FCU.

---

[2] In connection with the bankruptcy petition, the Debtor filed her *Schedules of Assets and Liabilities* (the "Schedules"), disclosing the existence of a checking account with the "VA Pittsburgh E.C.U." and a savings account at the "VA University E.C.U."

[3] During this case, there has been substantial confusion as to the names and relationships among the various VA credit unions to which the Debtor belonged. It is difficult to distinguish between each of credit unions because they have similar names and possess a convoluted history. For the purpose of this discussion, however, only the Pittsburgh FCU and University Drive FCU are material to these proceedings.

[4] Given that the sole remaining credit union entity acquired the assets and liabilities of its predecessor entities, the Court simply will refer to the Defendant Credit Union as the "Credit Union" unless it is necessary or helpful to establish a distinction between it and its predecessors.

[5] On Schedule F, the Debtor stated that the "V.A. Employees Fed. C. U." (at the University Drive location) held three (3) unsecured claims for approximately $4,500. On Schedule H, the Debtor disclosed that she was a co-debtor with Kiana Slaughter for a debt held by the "V.A. Employees Fed. C. U." (at the University Drive location).

The "VA Pittsburgh EFCU" also filed two (2) proofs of claim in this case. Claim No. 5 asserts an unsecured claim of $1,960.11 and Claim No. 6 asserts an unsecured claim of $892.76.

According to the Debtor, these postpetition loans included an automobile loan and certain unsecured loans used to cover the cost of a new refrigerator and a deposit to Equitable Gas.[6] At no time during the bankruptcy case did the Debtor, or any of her postpetition lenders, obtain Court approval for any postpetition financing.

At a hearing held on November 14, 2012 in connection with the Debtor's counsel's *Motion to Withdraw as Counsel* [Doc. No. 63], the Court was advised that the Debtor had been making postpetition payments to the Credit Union on a prepetition loan that had not been disclosed.[7] Thereafter, the Debtor filed an amended Schedule "F" [Main Case at Doc. No. 82] wherein she states that the Credit Union held a claim in an estimated amount of $3,000.

The parties stipulated that the Debtor paid the Credit Union $6,099.04 in postpetition payments on account of the prepetition unsecured obligations during the bankruptcy case. The parties also stipulated that the University Drive FCU received actual notice of the Debtor's bankruptcy petition.

### C.     The 2006 Mercury Montego Automobile

The Debtor was in the Credit Union's parking lot in February 2011 when she noticed a 2006 Mercury Montego automobile (the "2006 Mercury") with a "For Sale" sign in the window. In need of a car at the time, the Debtor went into the Credit Union's offices to inquire about the vehicle and was directed to speak with Ms. Curcio. The car was owned by James M. Curcio, the husband of Ms. Curcio.[8] According to the testimony, Mr. Curcio placed the "For

---

[6]  Although not directly relevant to the Court's analysis, testimony revealed that the Debtor obtained postpetition "payday" loans from other lenders as well.

[7]  Although not directly pertinent to the matters before the Court at this time, the record reflects that the Debtor and her prior counsel disagreed over how to proceed with respect to the Debtor's claims against the Defendants. As set forth by prior counsel, the *Motion to Withdraw as Counsel* was necessitated because the Debtor did not heed counsel's advice with respect to the issues involving the Credit Union.

[8]  The Debtor acknowledged this fact in her testimony.

4

Sale" sign in the 2006 Mercury and the telephone number on the sign would have connected potential purchasers to him directly. Ms. Curcio credibly testified that, while the Debtor was in her office, Ms. Curcio telephoned her husband to obtain his asking price. Ms. Curcio testified that her husband gave her the price of $9,000, which she then relayed to the Debtor while he was still on the phone.

The Debtor subsequently agreed to purchase the 2006 Mercury. On April 27, 2011, Ms. Curcio drove the Debtor to meet Mr. Curcio at an American Automobile Association ("AAA") location where he transferred the car's title to the Debtor. The Debtor and Ms. Curcio both testified that this was the only time that Mr. Curcio and the Debtor met. At the time of purchase, the 2006 Mercury had 66,000 miles on it.

The Debtor obtained financing for the car through the University Drive FCU, as evidenced by the Loan and Security Agreement attached as Debtor's Exhibit 11.[9] The Debtor testified that in order to obtain financing, the University Drive FCU required a letter from Mr. Curcio stating that he was selling the 2006 Mercury for $9,000 in a private sale. The letter, which the Debtor said was dated April 21, 2011, was not made part of the record, but the Debtor acknowledged that it was signed by Mr. Curcio.[10]

Ms. Curcio testified that she had no communications with the University Drive FCU regarding the financing of the 2006 Mercury. At the time, the Credit Union and the University Drive FCU were separate entities. Neither the Debtor nor the University Drive FCU sought Bankruptcy Court approval to enter into the postpetition automobile financing.

---

[9] The University Drive FCU records indicate that the Debtor's initial loan application for the 2006 Mercury was denied because she had a credit score of only 484. See Debtor's Exhibit 3. The credit union's board of directors reversed this decision and subsequently approved the loan.

[10] Although the Debtor objected to the actual admission of the letter into evidence, counsel did not object to the Credit Union's cross-examination which elicited testimony from the Debtor concerning the purpose of the letter and its contents.

5

In June 2012, the 2006 Mercury experienced a transmission failure rendering it inoperable. At the time of the transmission failure, the Debtor had owned the car for approximately 14 months and drove it approximately 17,000 miles. The Debtor testified that she had the vehicle inspected at the end of 2011, and at that time, there was no indication of any transmission problems with the vehicle. In February 2012, the Debtor's mechanic advised her that the car may have a transmission issue, but the Debtor nevertheless drove the car for another four (4) months before the transmission completely failed.

The Debtor sought a repair estimate from Biondi Motors ("Biondi") and was presented with two options: (i) a used transmission unit for $4,200; or (ii) a new transmission for $6,300. The Debtor chose to purchase a new transmission, and eventually the University Drive FCU agreed to finance the repair by rolling the costs into the existing auto loan. The University Drive FCU advanced one-half of the cost directly to Biondi to proceed with the repair.[11]

Biondi thereafter advised the Debtor that it might take up to six months to receive a new transmission from the factory. As an alternative, Biondi proposed to pay $3,700 for the trade-in value of the 2006 Mercury and provide a $3,500 rebate towards the purchase price of a new 2012 Mitsubishi Gallant. Even with the rebate and the trade-in value, the cost of the new automobile was more than $16,000. See Debtor's Exhibit 6. To pay this additional amount, the Debtor again sought financing from the University Drive FCU. This time, however, the University Drive FCU declined to make the loan. It concluded that the new loan was an investment risk and the Debtor could not afford the approximately $600 monthly payment. Based upon the testimony, it was the Credit Union's failure to approve a new car loan that precipitated this litigation.

---

[11] This sum was later refunded to the Credit Union, and the Credit Union refunded any payments made by the Debtor on the repair loan.

The Credit Union filed a *Motion for Relief from the Automatic Stay* [Doc. No. 74] (the "RFS Motion") with respect to the 2006 Mercury. The RFS Motion was not opposed by the Debtor (represented at that time by her current counsel, Dai Rosenblum, Esq.) and the requested relief was granted on November 28, 2012.

On June 3, 2013, the Debtor filed a motion requesting sanctions against Defendants for their alleged willful violation of the automatic stay. [Doc. No. 100]. On the same day, the Debtor also commenced an adversary proceeding against Defendants. [Adv. Doc. No. 1]. In her complaint, the Debtor asserts a claim for rescission and a cause of action under the Pennsylvania Unfair Trade Practices and Consumer Protection Law. The Court will now consider each request separately.

## II.

The Debtor's complaint focuses on two separate transactions. The first is the Debtor's purchase of the 2006 Mercury. The second is the financing agreement with the University Drive FCU that funded the purchase price. The Debtor alleges that Defendants engaged in various misrepresentations with respect to the condition of the 2006 Mercury. She also claims the vehicle loan was void *ab initio* as a result of the failure to obtain this Court's approval. Although it was never made entirely clear to this Court which of these two transactions the Debtor seeks to rescind, the result is the same for both—the Debtor has not established a legal basis for rescission.

### A. Did the Seller Act Through an Agent?

With respect to the sale of the car, it is undisputed that the owner of the 2006 Mercury was James Curcio, the husband of Defendant Pamela Curcio. Despite this, Mr. Curcio was not named as a defendant to this action. Given the extent of his involvement in the transaction, this is a glaring omission. Mr. Curcio established the price of the vehicle upon

7

receiving a phone call from his wife (made in the Debtor's presence). He signed a letter to support the Debtor's financing request which confirmed his intent to sell the car to the Debtor for $9,000. Mr. Curcio also met with the Debtor to sign over the vehicle's title.

The record contains no evidence that Pamela Curcio had any ownership interest in the 2006 Mercury. Accordingly, the Debtor must establish that Ms. Curcio acted as an agent for her husband if the sale is to be rescinded. Although Ms. Curcio introduced the buyer and seller, the Debtor did not demonstrate that Ms. Curcio's limited acts give rise to an agency relationship. See Girard Trust Bank v. Sweeney, 231 A.2d 407, 410 (Pa. 1967) (the burden of establishing agency rests with the party asserting it); see also Rantnetwork, Inc. v. Underwood, 2012 WL 1021326, *5 (M.D. Pa. March 26, 2012) ("The existence of an agency relationship is a question of fact (citations omitted)").[12]

The Debtor did not offer any evidence that Ms. Curcio was her husband's actual agent in this transaction. Rather, Ms. Curcio specifically denied that she was acting as her husband's agent, either actual or otherwise. To demonstrate an agency, the Debtor must establish that Ms. Curcio acted with apparent authority. "Apparent authority is the power to bind a principal which the principal has not actually granted out which he leads persons with whom his agent deals to believe that he has granted to the agent." Apex Fin. Corp. v Decker, 369 A.2d 483, 485 (Pa. Super. 1976), citing Revere Press, Inc. v. Blumberg, 246 A.2d 407 (Pa. 1968).

The test for apparent authority is "whether a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise." Id., citing Murphy v. Beverly Hills Realty Corp., 98 Pa. Super. 183 (1930). Through this transaction, it should have been clear that Ms. Curcio had no

---

[12] The sale and financing of the 2006 Mercury occurred within Pennsylvania, and therefore Pennsylvania law applies to the transaction.

authority to act on her husband's behalf. She had no knowledge of the sale price and was forced to call Mr. Curcio when the Debtor inquired about the car. The record also demonstrates that all of the essential elements of the deal were performed directly by Mr. Curcio as seller. He set the sale price, provided supporting documentation for the financing request, and transferred ownership of the vehicle to the Debtor. Aside from the mere fact they are married, nothing in the record suggests that Ms. Curcio acted with apparent authority for her husband.

**B.    Vehicle Financing Transaction**

It is undisputed that the University Drive FCU provided the financing that allowed the Debtor to purchase the 2006 Mercury. Debtor (who has an acknowledged history of obtaining postpetition financing without Court-approval) argues that, as a result of the University Drive FCU's failure to seek Bankruptcy Court approval for the loan, the entire transaction is void.[13] In support of this position, Debtor references Federal Rule of Bankruptcy Procedure 4001(c) and Local Bankruptcy Rule 4001-4(d). In the context of chapter 13 cases, it cannot be disputed that "postpetition earnings are the backbone of funding for the confirmed plan" and that therefore "subsequent credit transactions are subject to scrutiny by the Trustee and the Court." In re Brown, 170 B.R. 362, 364 (Bankr. S.D. Ohio 1994). To that end, before approving postpetition financing for chapter 13 debtors, this Court requires the filing of a motion that specifically sets forth, among other things, how the postpetition loan will impact other creditors. See, e.g., W.PA.LBR 4001-4(d)(8).[14]

The Debtor should have filed a motion seeking approval of the postpetition

---

[13]   Based upon the testimony, the Court need not examine the role of Ms. Curcio in the context of the financing. At the time of purchase, the University Drive FCU was a separate entity from Ms. Curcio's employer, the Credit Union. Ms. Curcio credibly testified that she had no communications with the University Drive FCU regarding the Debtor's proposed financing.

[14]   Similarly, the Debtor's confirmed chapter 13 Plan provides that all "ongoing payments for vehicles, mortgages and assumed leases are also paid through the Trustee." See Chapter 13 Plan Dated February 5, 2009, as confirmed by Order of Court dated August 5, 2009.

vehicle financing, and the University Drive FCU should have required a Court Order approving the transaction before lending the funds. However, in this case, no motion was filed. The Debtor nevertheless seeks to saddle all of the consequences onto the Credit Union by asking this Court to rescind the loan and return all amounts paid by the Debtor. Such a result would be inequitable, and would put the Debtor in a better position than when she started given that she had use of the car for nearly 14 months. Defendants established that although University Drive FCU was paid approximately $4,700 on the postpetition car loan between May 2011 and June 2012, it ultimately charged off the balance due on the loan and is not asserting a deficiency claim against the Debtor. The Debtor offered no evidence to suggest that there was fraud involved in the making of the loan, or that some other basis exists for rescission aside from the lack of Bankruptcy Court authorization for the transaction.

The Debtor cannot be wholly absolved from her responsibility to seek appropriate Court authority for her postpetition transactions. The Credit Union already has taken a loss on the loan and is not seeking a recovery against the Debtor. Accordingly, the Credit Union has been penalized for its failure to confirm that the Bankruptcy Court authorized the postpetition transaction prior to lending the money. The Debtor is at least as culpable as the Credit Union here to insure that the Court approves postpetition loans. Debtors are not entitled to all of the benefits and none of the burdens of the bankruptcy process. The Debtor failed to seek Court authority for the postpetition transaction, and in the absence of any other legal basis to rescind the loan transaction, the Debtor's claims for rescission are denied.

**C.    Pennsylvania Unfair Trade Practices and Consumer Protection Law Claims**

As noted above, the seller of the 2006 Mercury, Mr. James Curcio, is not a party to this action. For the reasons set forth above, Debtor did not establish that Defendant Pamela Curcio was the agent of the seller, and therefore could not be liable for any alleged

10

misrepresentations or warranties (implied or otherwise).

"To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004). Debtor has not established any wrongful conduct by Defendants in connection with the sale of the 2006 Mercury, nor did Debtor show that she justifiably relied on the Defendants' wrongful conduct or representation. Specifically, the Debtor failed to show that Ms. Curcio or her husband knew or should have known about a purported manufacturing defect involving the 2006 Mercury or cars of its type. The sole piece of evidence proffered by the Debtor in an attempt to impute knowledge to Defendants is a class action complaint filed in California alleging certain transmission defects in Ford Motor Company vehicles.[15] Absent proof of a knowing misrepresentation or a breached warranty, the Debtor's claims arising from the Pennsylvania Unfair Trade Practices and Consumer Protection Law cannot prevail and will be denied.

### III.

The parties stipulated that the Credit Union (through its predecessor University Drive FCU) received $6,099.04 in postpetition payments on account of a prepetition unsecured loan. Between the Petition Date and the 2012 merger, University Drive FCU received payments through a monthly allotment designated by the Debtor from her savings account. In other words,

---

[15] Although the Court took judicial notice of the class action pending at Rasico v. Ford Motor Company, et al.; Case No. 2:12-cv-09026-ABC-JCG (C.D. Ca. 2012), the Court does not impute knowledge of the class action on Defendants or the seller. The Debtor offered no evidence that seller or Defendant Curcio was aware of the transmission problems with the 2006 Mercury or any alleged defect involving the continuously variable transmission design. The Debtor also offered no evidence that seller or Defendant Curcio knew or should have known of the class action, or that such knowledge would give rise to a duty to disclose. Indeed, the class action was filed in 2012, well after the April 2011 sale of the 2006 Mercury at issue in this case. Finally, allegations contained in a complaint are just that—allegations. Debtor offered no evidence beyond a recitation of the claims made in the class action complaint. She offered no proof of the validity of such claims.

a direct transfer was made to University Drive FCU each month from the Debtor's accounts to satisfy the monthly loan payments. The parties further stipulated that the Credit Union received actual notice of Debtor's bankruptcy petition. At trial, Defendants conceded that the Debtor established a "technical" violation of the automatic stay set forth in 11 U.S.C. § 362. Therefore, the sole question for this Court's consideration is whether the violation was "willful" pursuant to 11 U.S.C. § 362(k) in order to fashion an appropriate remedy.

Section 362(k)(1) of the Bankruptcy Code governs willful violations of the automatic stay and provides as follows:

> Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1). Whether a creditor willfully violated the automatic stay is a question of fact. See, e.g., In re Ozenne, 337 B.R. 214, 218 (9th Cir. 2006).

"Willful" is not defined by the Bankruptcy Code. Accordingly, the Court is guided by caselaw. In general, a willful violation of the automatic stay is one where "a creditor violates the stay with knowledge that the bankruptcy petition has been filed." In re Lansdale Family Restaurants, Inc., 977 F.2d 826, 829 (3d. Cir. 1992). More specifically, however, the Third Circuit has adopted the following definition of willfulness:

> A 'willful violation' does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded.

In re Atlantic Bus. and Cmty. Corp., 901 F.2d 325, 219 (3d Cir. 1990), quoting In re Bloom, 875 F.2d 224, 227 (9th Cir. 1989).

Without the benefit of the entire record, and given the stipulated facts by the

parties, it might appear that a willful violation of the automatic stay occurred in this case. The facts of this case, however, frustrate such a straight-forward finding. Notably, in this case, testimony revealed that at various times, pre- and postpetition debt was combined and rolled into postpetition loans. The Debtor offered no evidence showing this Court which prepetition loans were paid postpetition. Indeed, it appears that the prepetition loan at issue had not been listed on the Debtor's Schedules until 2012, more than three years after the petition date. Additionally, based upon the testimony, it appears to this Court that the allotments from the Debtor's pay were established prior to the bankruptcy petition date, as were the automatic applications of those allotments to the Debtor's loan obligations.

Three other factors weigh significantly in the Court's consideration. First, the Defendants did not take any affirmative action in violation of the stay. Instead, the Credit Union failed to terminate an automated process established prepetition that sweeps funds from the Debtor's account. Second, the Debtor not only condoned this practice, she encouraged it with her repeated requests for additional postpetition loans. The Debtor therefore consented to this conduct because it provided her with continued liquidity. Lastly, although not dispositive, the Debtor offers no evidence that the Credit Union knew of the stay violations prior to 2012. Knowledge of the automatic stay is not required for a Court to find a violation (or even a willful violation), but the Court cannot ignore the many facts that are unique to this case.

Further complicating the analysis is the evidence that came to light at trial. Once the Debtor was advised that such payments were improper, she not only failed to take action, but repeatedly consented to further deductions. When her attorney learned of the postpetition payments in 2011, he suggested that she sue the Credit Union to recover the funds. In response, the Debtor testified that she had "no interest in suing the credit union" to recover those payments

and that, instead, she wanted to "maintain a relationship." She further testified that, at the time, she was "okay" with the credit union continuing to take payments from her savings account. It was only after the credit union refused to finance a new car that the Debtor re-evaluated her position and decided to take action on the stay violations. The Debtor said specifically that she felt like the credit union wronged me "after they did not give me the money for the new car."

A debtor cannot waive the protections of the automatic stay. ACandS, Inc. v. Travelers Cas. and Sur. Co., 435 F.3d 252, 259 (3d Cir. 2006) ("Because the automatic stay serves the interests of both debtors and creditors, it may not be waived and its scope may not be limited by a debtor" (citations omitted)). Yet the Court cannot ignore that the Debtor took no action to address the violation, even when recommended to do so by her counsel.

Given the automatic nature of the deductions that were established prior to the petition date, the Debtor has not established that the Credit Union's action was intentional. The Debtor cites to non-controlling cases holding that a credit union's continued receipt postpetition of automatic wage deductions, and their application to a prepetition loan, constitutes a willful violation of the automatic stay. See, e.g., In re Brooks, 132 B.R. 29 (Bankr. W.D. Mo. 1991). In Brooks, unlike the case before this Court, the defendant credit union denied the debtor's first request to stop the payment allocations, and told the debtor to instead cancel the paycheck allocations in response to the debtor's second request. Id. at 29. Only after the Brooks credit union refused to stop the automatic withdrawals after two requests did the debtor file an action for violation of the automatic stay. Id. The Debtor, however, never made any request to stop the automatic allotment deductions. To the contrary, she encouraged them because they facilitated her continued access to additional financing. As a result of her complicity, the deductions terminated well before any request to return the funds was made against Defendant Credit Union.

The Court is instead persuaded by the line of cases holding that automatic deductions from a debtor's account do not rise to the level of willfulness when they are neither deliberate nor intentional. See In re Crispell, 73 B.R. 375, 379 (Bankr. E.D. Mo. 1987) (holding that automatic debits from a debtor's account made after the bank had notice of the bankruptcy as a result of the bank failing to terminate the automatic debit feature did not result in willful violations of the automatic stay). "Automated actions are not 'willful' actions." In re Kondritz, 2011 WL 2292292, *6 (Bankr. S.D. Ind. June 8, 2011), citing In re Academy Answering Svcs., Inc., 100 B.R. 327, 330 (N.D. Ohio 1989). The Debtor testified that as of the date of the petition, she already had allotments from her pay in place, and that those allotments went to her savings account before automatically being applied to her loans. At no time did she ask the Credit Union to discontinue the automated allotments. Moreover, the Debtor did not establish that the act of applying the allotments to the Debtor's loans was an intentional act by the Credit Union.

Other courts have wrestled with facts similar to those presented to this Court. The Bankruptcy Court for the Northern District of Ohio, for example, faced a similar challenge—how to redress a violation of the automatic stay when a debtor remains "stealthily silent." See In re Houseworth, 177 B.R. 557 (Bankr. N.D. Ohio 1994) (analyzing whether a debtor can "recover against a creditor who acted in violation of the automatic stay where the debtor has knowingly remained "stealthily silent" and allowed the creditor to commit such violation."). Faced with the totality of the circumstances, the Houseworth court found that although "the Defendant's actions violated the automatic stay, Plaintiff was not without the ability to have prevented [Defendant's actions]" and the Court therefore exercised its equitable powers in refusing the award of attorneys' fees. Id. at 560 ("Allowing attorney's fees in such a situation would encourage debtor's attorneys to feign intention to reaffirm to inattentive creditors, then seek attorney's fees

for their actions"). The Court is well aware of the mandatory fee-shifting provision found in section 362(k) of the Bankruptcy Code providing that an individual injured by a willful violation of the automatic stay "shall recover actual damages." Nevertheless, given all of the circumstances of this case, the Court is faced with answering this question: Is the Debtor using the automatic stay violations as a means to shift the burdens arising from the Debtor's real source of frustration—the unfortunate loss of the 2006 Mercury? The Court answers that question affirmatively, and holds that in this case, the stay violation claim is a litigation tactic to recover attorney's fees, not to redress injury. This Court, as many other courts, must scrutinize those cases where a debtor's only injuries are the costs incurred in litigating the violation. See, e.g., In re Roman, 283 B.R. 1, 18 (9th Cir. BAP, 2002).

Although the Debtor's timing and actions give this Court pause with respect to her motivations, the Credit Union cannot escape blame either. The Court is dismayed that, although the Credit Union concedes it violated the automatic stay, it has yet to return the funds it improperly received. Based upon the record before it, at no time did the Credit Union offer or attempt to return the funds after the Motion and Complaint were filed. The failure to return funds acquired in violation of the automatic stay itself may give rise to a court's finding that the stay violation was willful. See, e.g., In re Velichko, 473 B.R. 64 (Bankr. S.D.N.Y. 2012).

A.   **Emotional Distress**

A willful violation of the automatic stay may give rise to damages for emotional distress. See, e.g., In re Wingard, 382 B.R. 892 (Bankr. W.D. Pa. 2008) (J. Deller). It is well established that "when the willful violator of the automatic stay has engaged in conduct that is patently or obviously egregious, emotional distress injuries may be proven merely by credible debtor testimony alone without resort to other extrinsic and corroborating evidence." Id. at 904. Such "obviously egregious" acts have included breaking into a debtor's house and threatening to

"blow [the debtor's] brains out" and calling the debtor in the evening and demanding to be paid immediately "or [the debtor is] going to regret it." Id. at 905. There has been no such obviously egregious conduct here where the violations were entirely passive in nature as a result of a savings allotment program established prepetition.

Although the Third Circuit has yet to rule on the issue, courts have developed several standards for plaintiffs seeking damages for emotional distress under section 362(k) of the Bankruptcy Code in the absence of "obviously egregious" acts. See In re Dean, 490 B.R. 662, 669 (Bankr. M.D. Pa. 2013). Generally, "courts have required that debtors prove emotional distress through the introduction of corroborating extrinsic evidence beyond mere self-serving testimony of the complainant." Wingard, 382 B.R. at 905, citing Stinson v. Bi-Rite Restaurant Supply, Inc. (In re Stinson), 295 B.R. 109, 120 n. 8 (9th Cir. BAP 2003).

The Debtor offers no corroborating extrinsic evidence beyond the testimony of Ms. Silvia Ford, the Debtor's sister. Ms. Ford testified that after the Debtor began having trouble with the Credit Union, the Debtor cried, suffered headaches, was depressed, had difficulty sleeping, and suffered from changes in posture due to problems with her back.[16] Ms. Ford said that without a car, the Debtor had to carry bags and it had been hard on the Debtor. However, the Debtor failed to demonstrate any causal connection between the alleged significant harm and the violation of the automatic stay. See In re Wingard, 382 B.R. at 905, quoting In re Dawson, 390 F.3d 1139, 1149 (9th Cir. 2004) (holding that, in addition to clearly establishing that existence of significant harm, an injured party must "demonstrate a causal connection between

---

[16] The Debtor offers her employee time records and testified that they establish that she had to take leave from her work as a result of the Credit Union's actions. See Debtor's Exhibit 8. The time records cover the period between June 26, 2012 and November 23, 2012, well after the prepetition loans were paid and the stay violations had ended. Additionally, the time records show that she took paid annual and/or sick leave. Nothing in the time records or the testimony at trial suggests to this Court that the Debtor lost any pay due to her time off of work.

17

the significant harm and the violation of the automatic stay (as distinct from the anxiety and pressure inherent in the bankruptcy process)").

If anything, Ms. Ford's testimony suggests that the distress suffered by the Debtor was as a result of not having a car rather than any violation of the automatic stay. At the time that the Debtor began her dispute with the Credit Union in 2012, the prepetition loans already were paid and the deductions on account of prepetition loans had ceased. For these reasons, even if the Debtor established the existence of significant harm, the Debtor has failed to demonstrate the requisite causal connection between such physical and emotional harm and the violations of the automatic stay.

### B.  Sanctions are Warranted Due to Credit Union's Actions

Although the Court does not find that the Credit Union's violation of the automatic stay to be willful under section 362(k) given the unique facts of this case, the Court nevertheless is troubled by the Credit Union's actions. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Court finds that the Credit Union's actions in this case justify the Court's use of this extraordinary power. Violations of the automatic stay, whether willful or not, threaten the foundation of the protections afforded by the Bankruptcy Code. In this instance, the violation potentially deprived the estate of funds that could otherwise be distributed to the Debtor's remaining creditors. The Credit Union acknowledges that not only was it aware of the bankruptcy, but concedes that it committed a "technical" violation of the automatic stay. Given the Credit Union's stated position, there is no justifiable basis for it to refuse to return the funds paid on account of prepetition loans. If consequences did not exist for this situation, it would encourage others to turn a blind eye in similar situations.

NOT FOR PUBLICATION

## IV.

The Credit Union obtained $6,099.04 in violation of the automatic stay, and applied those funds to the Debtor's prepetition loan obligations. The Court therefore grants, in part, Debtor's Motion and orders the Credit Union to return the amount of $6,099.04 to the bankruptcy estate. In addition, the Court holds the Credit Union in contempt for its failure and refusal to return those funds it acknowledges were obtained in violation of the automatic stay. The Court imposes a sanction against the Credit Union in the amount of $5,000.00. To the extent that the Debtor asserted individual claims for violation of the automatic stay against Ms. Curcio, such claims are denied. The Debtor's claims for rescission and arising under the Unfair Trade Practices and Consumer Protection Law are also denied.

An appropriate Order will issue.

Dated: 9/30/2014

GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE